[Cite as *State v. White*, 2021-Ohio-3284.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

CLERMONT COUNTY

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Appellee, | : | CASE NO. CA2020-07-039 |
| | : | O P I N I O N |
| - vs - | | 9/20/2021 |
| | : | |
| ROBERT L. WHITE, | : | |
| Appellant. | : | |

CRIMINAL APPEAL FROM CLERMONT COUNTY COURT OF COMMON PLEAS
Case No. 2019 CR 0149

Mark J. Tekulve, Clermont County Prosecuting Attorney, and Nicholas Horton, Assistant Prosecuting Attorney, for appellee.

W. Stephen Haynes, Clermont County Public Defender, and Robert F. Benintendi, Assistant Public Defender, for appellant.

**HENDRICKSON, J.**

{¶ 1} Appellant, Robert L. White, appeals from the sentence imposed by the Clermont County Court of Common Pleas following his guilty plea to six counts of misrepresentation in the sale of securities. For the reasons set forth below, we affirm appellant's sentence.

{¶ 2} On February 5, 2019, appellant was indicted on a 25 counts, consisting of six

counts of securities fraud in violation of R.C. 1707.44(G), six counts of misrepresentation in the sale of securities in violation of R.C. 707.44(B)(4), one count of engaging in a pattern of corrupt activity in violation of R.C. 2923.32(A)(1), ten counts of money laundering in violation of R.C. 1315.55(A)(4), one count of money laundering in violation of R.C. 1315.55(A)(1), and one count of money laundering in violation of R.C. 1315.55(A)(3).  With the exception of the engaging in a pattern of corrupt activity count, which was a felony of the first degree, all of the charged offenses were felonies of the third degree.  The charges arose following the actions appellant, an accountant, took after developing the idea of franchising his tax services.  As early as 2011, appellant began soliciting funds, which totaled more than $1.3 million dollars, from more than 80 of his clients and friends as investments in the promised franchises.  Appellant made statements to the investors as to the intended use of investor funds and created a marketing brochure and paperwork for investors showing the anticipated revenues for each year.  Appellant represented that returns on investor payments were guaranteed and would be made within a certain time frame.  However, appellant did not use the investors' funds in the manner promised and did not repay the funds to the investors.

{¶ 3}  On January 27, 2020, following plea negotiations, appellant pled guilty to six counts of misrepresentation in the sale of securities in exchange for the remaining offenses being dismissed.  As part of the plea agreement, the parties agreed that the restitution would not be limited to the victims of the six counts to which appellant pled guilty.  Rather, the restitution owed would include the victims of all 25 counts.  Appellant also acknowledged that the state would be seeking a prison sentence.

{¶ 4}  After engaging appellant in a Crim.R. 11(C) plea colloquy, the trial court accepted appellant's guilty plea and found that the plea was knowingly, intelligently, and voluntarily entered.  The court ordered a presentence-investigative report ("PSI") be

prepared and set sentencing more than five months out in order to give appellant time to make partial restitution to his victims. Appellant indicated his belief that he would be able to pay $100,000 to his victims by June 30, 2020 and another $100,000 the following year.

{¶ 5} On July 1, 2020, appellant's sentencing hearing commenced with an admission by appellant that he had not raised the $100,000 he had expected to be able to repay his victims. He indicated he had not been able to raise the expected funds due to the COVID-19 pandemic, the extension of the tax deadline for 2019 tax filings, and the publicity of his criminal case. Appellant indicated if he had more time, he believed he would be able to raise the funds.

{¶ 6} Defense counsel then informed the court that it had reviewed the prepared PSI and as to the restitution recommendation, appellant was not in a position to challenge the amount set forth in the PSI. Defense counsel indicated that "any challenge to the amount would not be really substantive anyway." Nonetheless, defense counsel stated it was appellant's position that restitution "at least to some degree, [is] less than [what] has been shown in the PSI."

{¶ 7} Defense counsel moved to continue sentencing so appellant could have a medical procedure done, but the court denied his request. Thereafter, defense counsel spoke in mitigation, noting appellant was 73 years old, had been a practicing accountant in Clermont and Brown Counties for more than 50 years, and, other than a couple minor traffic offenses, had no criminal record. Defense counsel noted that appellant had opened three locations for his tax business, intended to open further franchises, and always intended to pay back his investors for the money they loaned. However, appellant "began to experience cash flow and would borrow money from this person and pay it to this person. * * * [But] Mr. White, at all times, believed he was acting in good faith * * * [and] in his mind, he does not believe that he has committed a crime because he's always intended to pay everybody

back all the money that was borrowed." Defense counsel asked the court to impose a term of community control on appellant so that appellant would be able to continue to pay back his victims.

{¶ 8} Four individuals spoke on appellant's behalf at sentencing. One individual stated he had done work for appellant's tax businesses "for many years" and was owed about $20,000 to $30,000 for his work. He asked the court for leniency in sentencing appellant, in part, so that appellant would be able to work and pay his debts. Another individual, who had been a tax client of appellant for nearly 30 years, stated his belief that appellant had "good intentions" and would pay back everything owed to the victims if given enough time.

{¶ 9} The other two individuals who spoke on appellant's behalf were victims of appellant's investment scheme. One man, who said appellant had done his taxes for about 30 years, stated that he believed appellant was "close to" opening the promised franchises when appellant's computers were seized as part of the criminal investigation. He believed appellant was within six months of closing on a number of deals. He did not believe appellant had pulled the wool over his eyes in their business dealings but, rather, that appellant had merely gotten in over his head. The other victim who spoke on appellant's behalf indicated appellant had done his taxes for 10 to 15 years before approaching him with an investment opportunity. This individual stated he knew he was taking a chance by investing his money with appellant. He believed appellant was a good person, although he was shocked to learn how much money appellant had taken from investors.

{¶ 10} Appellant then spoke, telling his victims he was "immensely sorry" for what he had put them through. He stated that though he had a "[g]reat plan" for opening his franchises, he had the "[w]rong execution." Appellant explained different offers and investments that had fallen through over the years and other obstacles that prevented him

from achieving his franchising goals.  Appellant claimed that for three years in a row he had his own "small pandemic[s]."  The first year, two key employees left at the same time.  The second year, one key employee passed away and the other moved to Florida to take care of a parent.  The third year, his tax business had a ransomware attack.  He then faced another setback when law enforcement sized his server and did not return it for well over a year.

{¶ 11} Appellant denied that he used investment money to buy "fancy things" for himself, his family members, his girlfriend, or his girlfriend's children.  Appellant claimed the money was spent on overhead, staff, and keeping some tax locations open longer than they should have been.  He also explained that in the five-month delay between the plea proceedings and sentencing hearing he had not been able to contribute more to restitution as the publicity and media attention surrounding his case had stopped some clients and potential business partners from communicating with him.  Appellant asked the court to impose a sentence that would allow him the opportunity to regrow his business to demonstrate his commitment to paying back his victims.

{¶ 12} Nine of appellant's victims then spoke about their dealings with appellant and the economic hardships they have faced as a result of appellant's actions.  Consistent among all their stories was that appellant was a "very smooth talker" who made many unfulfilled promises about where their investment money would be going and what type of returns they would see on their investment.  One victim stated that she had invested $12,500 with the promise that she would receive one percent interest on her investment within six months.  However, she never received a penny back from appellant.  When she developed cancer and had to have major surgery in 2018, she approached appellant about getting back her money.  Though appellant promised to send her a check, he never sent one.

{¶ 13} Another victim stated that after investing $10,000 with appellant in 2014, his life "got turned upside down" when his wife died unexpectedly. The investor sought to retrieve some of the money he had invested in order to pay for his wife's funeral. Appellant offered the victim $100. Appellant, who was the victim's accountant, stopped responding to tax matters for the victim. The victim's 2013 tax return, which had been prepared by appellant, was audited by the IRS. The victim provided a box of records to appellant for purposes of handling the audit. The victim believed appellant had the matter handled but later learned that appellant had not shown up to the IRS audit. The victim hired someone else to handle the audit and asked appellant for a return of his tax records, but was advised appellant had lost the documents. The victim stated he ended up owing the IRS $100,000 and had to declare personal bankruptcy.

{¶ 14} One victim, who had known appellant since appellant was a teenager, invested his entire life savings, over $300,000, with appellant. He had not received any of the funds back from appellant. The victim suffered a stroke, had to sell his house, and is now renting a room from a friend because of the financial troubles he has faced since investing with appellant. The victim also received notice that his taxes for years 2013 through 2019 had not been filed, despite claims by appellant that appellant had filed the taxes. The victim subsequently received a letter stating that appellant did not have a license to submit taxes.

{¶ 15} Another victim indicated that he invested $12,500 with appellant and was promised quarterly reports, which he never received. When there was no return on his investment and he could not get any answers as to where his money had gone, the victim asked appellant to return the money. Appellant told the victim he could have the money returned if he gave 90-days' notice. Despite providing this notice, appellant never returned the funds.

{¶ 16} Another victim stated that starting in 2012, she and her husband signed five promissory notes with appellant and invested around $31,000. Appellant had paid back all but $5,140. Appellant usually paid the victim in small increments, writing checks for around $200 or $300 and telling her not to cash them for some time. One night appellant called the victim drunk and she demanded answers as to where the rest of her money was and when it would be paid to her. Appellant responded that he had hidden money in a PVC pipe in a lake and he could not get the funds out until the spring.

{¶ 17} The last victim to speak at the sentencing hearing stated that he and his wife invested in appellant's business only after appellant visited the couple's home and assured them that they would at least get their money back if they invested with him. Appellant told the couple to give him a year to get everything up and running. When the victim called appellant after a year to check on matters, appellant did not remember that the victim had invested. Appellant consistently requested more time whenever the victim contacted him.

{¶ 18} Following the victims' statements, the state requested that the court impose a "significant prison [term]" on appellant as appellant was merely a "con man and * * * a thief" who took money from more than 80 people based on promises of franchises and returns that he never fulfilled. The prosecutor noted that the criminal case against appellant began on a report to the Union Township Police Department by one of the victims. That victim had been followed by appellant to the police station, where appellant told the victim her issue was a civil matter, not a criminal matter, and that nothing would come of her complaint as his son worked at the police department. The state expressed concern that if a prison sentence were not imposed, appellant would continue his conduct, as he did not appear remorseful and continued to suggest that he would have been able to pay everyone back and open his franchises if only the police had not taken his computers and become involved in his business dealings.

{¶ 19} After the state concluded its remarks, appellant was given the opportunity to again address the court. Appellant indicated that he did have remorse, not only for his victims but also for his family. He challenged the accuracy of some of the statements made by his victims and the state, stating he never ran a Ponzi scheme where he took money from one investor to pay off another investor and that he had not tried to prevent one of the victims from reporting his conduct to law enforcement by following her to the police station. He then stated that he wished he had money to hire a forensic accountant as he believed there were holes in some of the information provided to the prosecutor and the court. He indicated that he would not stop trying to pay his victims back and that he believed there was "significant revenue" that was about to come into his tax business. He promised that a "chunk" of that revenue could be brought to the court to help pay down the amount owed in restitution.

{¶ 20} After hearing from appellant, the state, the victims, and those who wished to speak on appellant's behalf, the court indicated it had reviewed the lengthy and detailed PSI report. The court discussed the amount of restitution owed to the victims, noting that it was only ordering restitution as to the verified amount of money the court could determine the victims had invested with appellant; the court would not include any interest payments or promised interest in its restitution award. Defense counsel interjected and stated that as to the amount of restitution owed to each victim, appellant would stipulate to the amounts listed in the PSI as he was not in the position to challenge the figures. The court listed the name of each victim and the specific amount they were owed. In total, the court ordered restitution in the amount of $1,307,213.11.

{¶ 21} The court then stated it had considered the principles and purposes of felony sentencing under R.C. 2929.11 as well as the seriousness and recidivism factors set forth in R.C. 2929.12. The court noted that while appellant had a minimal record and had

accepted responsibility for his actions, he had not expressed genuine remorse. The court found appellant had taken advantage of his relationships with the investors, many of whom he had built relationships with over significant periods of time. Though appellant did not physically hurt his victims, appellant had "ruined them emotionally" and, to some extent, took away their "ability to just survive." The court imposed an 18-month prison term on each of the six counts of misrepresentation in the sale of securities and ran the sentences consecutively to one another for an aggregate prison term of nine years.

{¶ 22} Appellant appealed his sentence raising three assignments of error for review.

{¶ 23} Assignment of Error No. 1:

{¶ 24} THE TRIAL COURT ERRED IN FAILING TO CONSIDER APPELLANT'S PRESENT AND FUTURE ABILITY TO PAY.

{¶ 25} In his first assignment of error, appellant argues the trial court committed plain error in declining to consider his present and future ability to pay before ordering restitution, as required by R.C. 2929.19(B)(5). In response, the state contends the trial court was not required to consider appellant's ability to pay because Marsy's Law, Article I, Section 10a(A) of the Ohio Constitution, entitles victims to full and timely restitution, thereby making the court's consideration of appellant's ability to pay irrelevant.

{¶ 26} This court recently addressed an identical argument in *State v. Oliver*, 12th Dist. Clermont No. CA2020-07-041, 2021-Ohio-2543, ¶ 52-73. We concluded that R.C. 2929.19(B)(5), which requires a trial court to consider an offender's ability to pay before ordering restitution, was in conflict with Marsy's Law, which states that a victim is entitled "to full and timely restitution from the person who committed the criminal offense or delinquent act against the victim" and the victim's right "shall be protected in a manner no less vigorous than the rights afforded to the accused." Article I, Section 10a(A)(7), Ohio Constitution. *See Oliver* at ¶ 67. As we noted in *Oliver*:

- 9 -

[t]he use of the word "full" to describe the restitution owed to a victim does not leave room for any implication that the amount of restitution could be reduced or limited after consideration of the offender's ability to pay, or that the restitution order could be anything less than "complete" restitution. Additionally, because the legal use of the word "restitution" means to make a victim whole after injury, the plain language of Marsy's Law unambiguously provides that a victim is entitled to the complete amount that will make him whole. Allowing the consideration of the offender's ability to pay to potentially lessen or eliminate the amount of restitution owed to a victim would effectively render the word "full" meaningless.

*Id.*

{¶ 27} "[T]o the extent R.C. 2929.19(B)(5) allows the trial court to reduce a victim's restitution amount, or otherwise alter the offender's responsibility to provide full and timely restitution to the victim, * * * the statute irreconcilably conflicts with the constitutional provision." *Id.* at ¶ 70. It is well settled that "where constitutional provisions and the legislative enactment are 'so clearly in conflict that they cannot both stand the statutory provision must fail.'" *Id.* at ¶ 71, quoting *State ex rel. Price v. Huwe*, 105 Ohio St.3d 304, 306 (1922). Accordingly, "Marsy's Law supersedes R.C. 2929.19(B)(5) to the extent the statute allows the trial court to reduce or otherwise modify the restitution amount owed to the victim." *Id.* A trial court does not commit plain error in declining to consider a defendant's ability to pay prior to ordering restitution given the constitutional requirement in Marsy's Law to impose "full" restitution. *Id.* at ¶ 72 ("we cannot say the trial court erred in failing to consider [the defendant's] ability to pay where the trial court was prohibited from reducing or modifying that amount, regardless of [the defendant's] ability to pay").

{¶ 28} Therefore, in reliance on *State v. Oliver*, supra, we find that the trial court was prohibited from reducing or modifying the amount of restitution owed to appellant's victims, regardless of appellant's present or future ability to pay said restitution. The trial court did not err in failing to consider appellant's ability to pay prior to imposing the restitution order.

Appellant's first assignment of error is overruled.

{¶ 29} Assignment of Error No. 2:

{¶ 30} THE TRIAL COURT ERRED IN ORDERING APPELLANT'S SIX TERMS OF IMPRISONMENT TO RUN CONSECUTIVELY.

{¶ 31} In his second assignment of error, appellant argues the trial court erred by sentencing him to consecutive prison terms because the record does not support the imposition of consecutive sentences.

{¶ 32} This court reviews felony sentences pursuant to the standard of review set forth in R.C. 2953.08(G)(2) to determine whether the imposition of those sentences is clearly and convincingly contrary to law. *State v. Julious*, 12th Dist. Butler No. CA2015-12-224, 2016-Ohio-4822, ¶ 8. Pursuant to that statute, an appellate court may modify or vacate a sentence only if, by clear and convincing evidence, "'the record does not support the trial court's findings under relevant statutes or that the sentence is otherwise contrary to law.'" *State v. Harp*, 12th Dist. Clermont No. CA2015-12-096, 2016-Ohio-4921, ¶ 7, quoting *State v. Marcum*, 146 Ohio St.3d 516, 2016-Ohio-1002, ¶ 1. A sentence is not clearly and convincingly contrary to law where the trial court considers the purposes and principles of sentencing as set forth in R.C. 2929.11, as well as the seriousness and recidivism factors listed in R.C. 2929.12, and sentences a defendant within the permissible statutory range. *State v. Brandenburg*, 12th Dist. Butler Nos. CA2014-10-201 and CA2014-10-202, 2016-Ohio-4918, ¶ 9.

{¶ 33} Pursuant to R.C. 2929.14(C)(4), a trial court must engage in a three-step analysis and make certain findings before imposing consecutive sentences. *State v. Dillon*, 12th Dist. Madison No. CA2012-06-012, 2013-Ohio-335, ¶ 9. First, the trial court must find that the consecutive sentence is necessary to protect the public from future crime or to punish the offender. *Id.*, citing R.C. 2929.14(C)(4). Second, the trial court must find that

consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public. *Id.* Third, the trial court must find that one of the following applies:

> (a) The offender committed one or more of the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to section 2929.16, 2929.17, or 2929.18 of the Revised Code, or was under post-release control for a prior offense.
>
> (b) At least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct.
>
> (c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender.

R.C. 2929.14(C)(4)(a)-(c).

{¶ 34} "A trial court satisfies the statutory requirement of making the required findings when the record reflects that the court engaged in the required analysis and selected the appropriate statutory criteria." *State v. Setty*, 12th Dist. Clermont Nos. CA2013-06-049 and CA2013-06-050, 2014-Ohio-2340, ¶ 113. In imposing consecutive sentences, the trial court is not required to provide a word-for-word recitation of the language of the statute or articulate reasons supporting its findings. *Id.* Nevertheless, the record must reflect that the trial court engaged in the required sentencing analysis and made the requisite findings. *Id.* The court's findings must thereafter be incorporated into its sentencing entry. *State v. Ahlers*, 12th Dist. Butler No. CA2015-06-100, 2016-Ohio-2890, ¶ 10.

{¶ 35} Appellant concedes that the necessary findings under R.C. 2929.14(C)(4) were made at his sentencing hearing and that the findings were included in his sentencing entry. However, he argues that the record does not support the imposition of consecutive

sentences as consecutive sentences are disproportionate to the danger he poses to the public. We disagree.

{¶ 36} While appellant, who was 73 years old at the time of sentencing, did not have prior criminal convictions, the record nonetheless supports the court's imposition of consecutive sentences. Although appellant did not get caught in his fraudulent investment scheme for years, his actions spanned nearly a decade and created economic hardships and destroyed the lives of more than 80 people. Appellant used his position as an accountant and friend to gain his victims' trust and steal their hard-earned money. Some victims lost their entire life savings. Other victims who appellant failed to repay struggled to pay unexpected expenses. Appellant appeared unconcerned with their struggle, offering one victim only $100 of the $10,000 the victim invested when the victim's wife died and the victim had to pay for his wife's funeral. Another victim who was diagnosed with cancer did not receive a refund of any of her investment, despite appellant's promises to send her a check.

{¶ 37} Appellant kept his criminal investment scheme going for so many years by taking money from one person and using it to repay others. Appellant ignored his victims' efforts to get their money back, often times stringing the victims along with promises to repay their investments in the near future – a future that never came to fruition. Appellant always told investors he was just a few months away from making a deal that would allow him to make all of his victims whole. Even at sentencing appellant suggested that he was about to come into "significant revenue" and that he would be able to turn a "chunk" of it over to the court to repay part of what was owed to the victims.

{¶ 38} The nature of appellant's crimes carry significant weight in determining the risk he poses to the community. Appellant has demonstrated a prolonged and continued ability to deceive and manipulate his tax clients and members of the community, many of

whom he had developed longstanding personal relationships with over many years. Appellant's failure to express genuine remorse for the hardships he has caused and his failure to understand the criminal nature of his actions demonstrate the continued danger he poses to the public. Accordingly, given the circumstances of the present offenses, we find that the imposition of consecutive sentences is not disproportionate to the danger appellant poses to the public and that the trial court's finding is not clearly and convincingly unsupported by the record.

{¶ 39} As the record supports the findings made by the trial court under R.C. 2929.14(C)(4), we conclude that the trial court did not err in imposing consecutive sentences. Appellant's sentence is supported by the record and is not contrary to law, and his second assignment of error is, therefore, overruled.

{¶ 40} Assignment of Error No. 3:

{¶ 41} APPELLANT'S TRIAL COUNSEL WAS INEFFECTIVE.

{¶ 42} In his third assignment of error, appellant argues he received ineffective representation due to counsel's failure to object to the trial court's decision not to consider his ability to pay before ordering restitution and counsel's decision to stipulate to the restitution figures listed in the PSI, as determined by the probation department.

{¶ 43} "In order to prevail on an ineffective-assistance-of-counsel claim, a defendant must prove that counsel's performance was deficient and that the defendant was prejudiced by counsel's deficient performance." *State v. Davis*, 159 Ohio St.3d 31, 2020-Ohio-309, ¶ 10, citing *State v. Bradley*, 42 Ohio St.3d 136, 141-142 (1989), and *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052 (1984). "Thus, the defendant must demonstrate that counsel's performance fell below an objective standard of reasonableness and that there exists a reasonable probability that, but for counsel's error, the result of the proceeding would have been different." *Id.*, citing *Bradley* at paragraphs two and three of

the syllabus. "'A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Bradley* at 142, quoting *Strickland* at 694. The failure to satisfy either the deficiency prong or the prejudice prong of the test is fatal to a claim of ineffective assistance of counsel. *State v. Madrigal*, 87 Ohio St.3d 378, 389 (2000).

{¶ 44} As to appellant's claim of ineffective assistance for counsel's failure to object to the court's decision not to consider appellant's present and future ability to pay restitution, we find that appellant cannot demonstrate any prejudice. As we explained in our resolution of appellant's first assignment of error, Marsy's Law supersedes R.C. 2929.19(B)(5) and prohibits the court from reducing or modifying the "full" amount of restitution owed to a victim, regardless of a defendant's ability to pay said restitution. *Oliver*, 2021-Ohio-2543, ¶ 71-72. Any objection to the court's failure to consider appellant's ability to pay would, therefore, have been futile and would not have changed the outcome of the proceeding. *Oliver* at ¶ 94.

{¶ 45} As for appellant's claim that counsel was ineffective for stipulating to the restitution figures set forth in the PSI, we find no merit to his argument. Appellant cannot show he was prejudiced by counsel's stipulation as the record supports the restitution ordered by the court. The amount of restitution the court awarded for each victim was limited to those amounts that could be verified based on promissory notes and letters of intent signed by appellant, as well as images of checks written by the victims to appellant. When certain amounts could not be verified, the trial court did not order restitution as to those amounts.

{¶ 46} Additionally, trial counsel's decision to stipulate to the restitution figures was a strategic decision. Defense counsel did not dispute the amount of restitution owed, seeking to use appellant's need to pay restitution to encourage the court to impose a community control term or a minimum prison sentence on appellant. *See State v. Floyd*,

10th Dist. Franklin No. 19AP-449, 2020-Ohio-4655, ¶ 39 (finding defense counsel's decision to defer to the court on restitution did not constitute ineffective assistance of counsel as it was a trial strategy); *State v. Betliskey*, 8th Dist. Cuyahoga No. 101330, 2015-Ohio-1821, ¶ 52-53 (finding that defense counsel's decision not to object "to the trial court's imposition of the restitution order, fines, and court costs" constituted "matters of trial strategy"). Appellant's third assignment of error is, therefore, overruled.

{¶ 47} Judgment affirmed.

M. POWELL, P.J., and BYRNE, J., concur.